OPINION OF THE COURT
Roger S. Hayes, J.
*136 Defendant Reynoso is charged with criminal sale of a controlled substance in the first degree and criminal possession of a controlled substance in the second and third degrees. (Penal Law § 220.43 [1]; § 220.18 [1]; § 220.16 [1].) Defendants Concepcion and Florian are charged jointly with criminal possession of a controlled substance in the second and third degrees, and each is charged separately with resisting arrest. (Penal Law § 220.18 [1]; § 220.16 [1]; § 205.30.) Prior to trial, the defendants moved to suppress physical evidence consisting of 3,330 glassines of heroin, over $28,000 in United States currency and beepers. A Mapp hearing was held on those motions. Based on the findings of fact and conclusions of law set forth below, the defendants’ motions are denied.
THE EVIDENCE AT THE MAPP HEARING
At the hearing, the People called Sergeant Ahkem Chu as well as Police Officers Angel Rosa and Joseph Spiekermann, who testified as follows: On August 15, 1995, Officer Rosa, a trained and experienced narcotics investigator, was assigned to an observation post situated on the roof of a six-story residential building located at 446 138th Street in Bronx County. Using. binoculars, Officer Rosa surveyed from a distance of about 200 feet 138th Street between Willis Avenue and Brown Place while his "ground team” waited in marked police cars for his transmissions. The surveyed area was a long, well-lit block of residential and commercial dwellings; traffic was heavy and people were "hanging around” or "waiting” outside. Based on his prior work at the post, his past observations of drug transactions in the area and his interaction with the community, Officer Rosa knew that the area was a drug marketplace and could identify the "players” who operated there.
At about 11:00 p.m., Officer Rosa saw a gray four-door Pontiac with tinted windows moving east on 138th Street towards a building located at 466 138th Street. Officer Rosa recognized the Pontiac from previous sightings during which "known drug dealers” had "hung around” the car. He also knew that the police had received anonymous telephone calls that someone was "dealing” from a "gray” "Pontiac” with "tinted windows”. The Pontiac parked in front of the building about a foot behind one car and a car length in front of another car. After a few minutes, the Pontiac suddenly drove a short distance forward and an equal distance in reverse several times. Officer Rosa concluded that the driver was not attempting to park the Pontiac since the car behind it was at least a car length away and *137 therefore the driver should not have had "any difficulty getting into the spot”.
About three months before his observation of the Pontiac’s back-and-forth movements, Officer Rosa learned from fellow officers with extensive training in crimes involving automobiles that some automobiles were outfitted with "traps”, hidden compartments designed and installed in automobiles expressly to conceal contraband. Such traps were frequently used by participants in the drug trade. Officer Rosa further learned that such traps were commonly hidden behind dashboards, where they could be accessed by doors which could be opened only after the performance of certain steps. The steps functioned like a combination for a safe: when they were properly performed, they would activate a hydraulic mechanism which in turn would open a door to the hidden compartment. Officer Rosa additionally learned that one common combination involved driving forward, braking and then driving in reverse. The officer also had participated in an April 1995 arrest involving an automobile trap.
At the time of his observation of the Pontiac’s back-and-forth movements, Officer Rosa did not suspect that the movements were undertaken to open a trap. Officer Rosa testified on cross-examination that he did not record his observation of the movements in his memo book or other police reports. He also testified on cross-examination that he did not remember whether he had told the Assistant District Attorney or Attorneys who had interviewed him in the complaint room about the car’s back-and-forth movements; but Officer Rosa believed that he had mentioned the movements in radio transmissions contemporaneously made to members of this ground team because "that’s really what aroused [his attention] to the car”. When the court asked the officer to explain why he did not record the movements in his paperwork, he responded: "I don’t know why I didn’t put it in there, I should have put it in there, but I didn’t. All I can say, that’s what drew my attention to the vehicle, but that wasn’t the reason for the stop. The reason for the stop was the exchange that I observed. That just brought my attention to the car. It was only later on that I thought there might be a trap in the car due to the fact that the car was going back and forth” (emphasis added). Thus, Officer Rosa’s suspicion that the movements were a combination performed to open a trap arose after the officer’s completion of his paperwork.
When the Pontiac stopped moving back and forth, Officer Rosa saw a man, later identified as Reynoso, carrying a beige *138 bag on his right shoulder and repeatedly looking around. The bag looked "full” since it was "rounded” and appeared to be "weighted down” by its contents. Reynoso approached the Pontiac’s front passenger window, removed the bag from his shoulder, bent down and conversed with one or more of the car’s occupants. After opening the bag and displaying its contents to the Pontiac’s occupants, Reynoso nodded affirmatively and placed the bag inside the car. He then opened the rear door on the Pontiac’s passenger side and retrieved a brown, leather knapsack which he slung over his shoulder. After concluding the exchange of the bag for the knapsack, Reynoso closed the Pontiac’s rear door, looked around, moved away from the car and walked west on 138th Street.
Officer Rosa sent a series of radio transmissions to his ground team in which he stated that he had observed a "narcotics transaction” or "drug sale” on "[E]ast 138th Street between Brown Place and Willis Avenue in front of a church”. Officer Rosa described Reynoso as a "male Hispanic” about "five foot ten” or "six feet” with "dark hair” and an "olive complexion” wearing a "dark leather jacket”, a "black shirt” and "dark pants”. The officer described the car involved in the exchange as a "grey four door Pontiac with tinted windows parked in front of 446 [E]ast 138th Street”. Officer Rosa also stated that Reynoso engaged in apparent conversation with an occupant of the Pontiac and gave the occupant a "canvas bag”. The officer then noted that Reynoso received a "leather knapsack” from the occupant and walked west on 138th Street. Officer Rosa further described Reynoso’s actions of looking up and down the street during the exchange. While, at the hearing, Officer Rosa did not remember whether he had transmitted a description of the Pontiac’s back-and-forth movements, Sergeant Chu specifically recalled that the officer had spent about 10 minutes describing his observation of the Pontiac moving "reverse and forward” in the "same parking spot” about "four or five times” with corresponding signals from its "parking” and "reverse” lights.
Upon receiving Officer Rosa’s transmissions, Sergeant Chu concluded that "the probability of a trap being in the vehicle was very high”. Sergeant Chu had spent six years as an undercover officer and investigator in the field of organized crime. During that period, Sergeant Chu had received lectures and written material from the Drug Enforcement Agency and other sources regarding traps. Based on that training and experience, Sergeant Chu knew that drug dealers used traps to *139 conceal drugs and firearms from rival drug dealers and police officers. Again using his training and experience, Sergeant Chu concluded that the exchange Officer Rosa described was not an innocent transaction involving "groceries” or "sports equipment”. He concluded that Reynoso’s conduct of "looking up and down the block” and of conversing with the Pontiac’s occupants immediately after the parked automobile had executed a series of four or five back-and-forth maneuvers indicated a transaction more complex than a mere exchange of innocuous items.
Sergeant Chu and Officer Spiekermann, who also had received Officer Rosa’s transmissions, rode in separate marked police cars to the location of the exchange, arriving as Reynoso was still walking west, away from the Pontiac, on the south side of 138th Street. At that point, Officer Spiekermann saw Reynoso look in his direction, and Officer Rosa saw Reynoso slow down and shift the knapsack from his shoulder facing the police cars to his other shoulder. Sergeant Chu noticed that Reynoso was a "male Hispanic” with an "olive complexion” wearing a "black leather jacket” with "dark pants” and carrying a "leather knapsack”. Officer Spiekermann similarly noticed that Reynoso was a "male Hispanic” wearing a "dark colored jacket” and carrying a "brown or beige” "knapsack on his shoulder”. Sergeant Chu asked Officer Rosa by radio if Reynoso — now about 50 feet from the site of the exchange and the police cars — was the man who had engaged in the exchange with the Pontiac’s occupants; the officer responded, "yes”.
Pursuant to that confirmation, Sergeant Chu and Officer Spiekermann emerged from their cars and approached Reynoso. At that point, the Pontiac quickly departed from the site of the exchange and sped east on 138th Street. Officer Rosa immediately sent another radio transmission to the team stating that the Pontiac was leaving. In response, Sergeant Chu ran back to his police car and pursued the Pontiac as it rode at a "very high” speed east on 138th Street, made a sharp right turn and rode south on Brown Place. While Sergeant Chu could not recall whether the Pontiac displayed an appropriate signal when it turned, Officer Rosa remembered that the Pontiac did not signal. Sergeant Chu pursued the Pontiac on Brown Place until it turned into a parallel parking space and parked at an angle to the curb. The sergeant directed the Pontiac’s occupants to remain in the car and sent a radio transmission seeking police support.
Meanwhile, Officer Rosa descended to the street where Reynoso, with the knapsack still on his shoulder, was "flailing his *140 arms” to avoid being placed in handcuffs by Officer Spiekermann and another officer. After helping the officers place Reynoso in handcuffs, Officer Rosa opened the knapsack and found bundles of United States currency and a red box or "tin” intended for Nabisco graham crackers. Inside the Nabisco container were additional bundles of money. Officer Spiekermann also saw currency in the knapsack. Officer Rosa sent á radio transmission to Sergeant Chu stating that the police had apprehended Reynoso and had recovered "a lot of money”. Officer Spiekermann then rode with Reynoso to the 40th Precinct.
A police car arrived at 138th Street and Brown Place in response to Sergeant Chu’s transmission for support, and the officers removed the Pontiac’s driver, later identified as Florian, from the car and placed him in handcuffs after he resisted by "slipping off the back of the trunk onto the street” and placing "his hand underneath his chest”. Sergeant Chu removed the Pontiac’s passenger, later identified as Concepcion, from the passenger side of the car and, with the aid of another officer, placed him in handcuffs after he resisted by refusing to offer his hands to be handcuffed. Officer Rosa also arrived in response to Sergeant Chu’s transmission and saw Concepcion and Florian in handcuffs. Officer Rosa previously had seen Concepcion in the "area of 138th Street” and Florian "maybe a couple of times”. The Pontiac was parked on Brown Place with the doors open and the beige bag on the front passenger seat. The police took Concepcion and Florian as well as the Pontiac to the 40th Precinct.
At about 11:20 p.m., Officer Rosa arrived at the precinct and searched the defendants, recovering United States currency from Reynoso and beepers from Concepcion and Florian. More than $28,000 in United States currency was recovered from the knapsack. At about 11:30 p.m., Officer Rosa searched the Pontiac. During that 15-minute search, Officer Rosa recovered the beige bag from the front seat and discovered that it was empty. At the beginning of the search, Officer Rosa did not attempt to open the suspected trap by imitating the previously seen back-and-forth movements because the trap was already partially open: the officer discovered a slit about an inch long in the dashboard between the speedometer and steering column. Officer Rosa shined a flashlight into the slit and saw a block wrapped in brown paper and tape. The block was partially open, exposing a "small bundle wrapped in rubber-bands” and "magazine type” paper. Based on his training and experience in the "way heroin is packaged and wrapped”, Of *141 fleer Rosa concluded that the small bundle contained 10 glassine envelopes of heroin.
Officer Rosa put his finger in the slit and pulled it, revealing two hydraulic canisters. This observation was consistent with Officer Rosa’s knowledge of the use of a hydraulic device to open a trap’s door. Officer Rosa flashed his light into a long hole behind the slit and saw additional blocks wrapped in brown paper and tape. Officer Rosa ripped open the dashboard and removed all the blocks — at least 10 — and opened them. The blocks contained small packages wrapped in "magazine type” paper. Officer Rosa examined the small packages and discovered that they contained a total of 3,330 white glassine envelopes filled with heroin and stamped with the name "Total Control”. At some point before ripping the dashboard, Officer Rosa attempted unsuccessfully to open the trap by various combinations, including driving the car back and forth, turning on the air conditioning and pressing the emergency brake.
FINDINGS OF FACT
I find that the People’s witnesses testified truthfully. Therefore, my factual findings are consistent with their testimony as it is summarized above. However, one particular credibility finding requires elaboration. Officer Rosa conceded on cross-examination that he had failed to mention the Pontiac’s back-and-forth movements in his police paperwork. At first glance, this would appear to be a major impeachment of the officer’s credibility on an important issue. However, I find that the officer gave a credible explanation for his omission in the paperwork, namely, that when he completed his paperwork he felt his observation of the exchange of the bag for the knapsack, rather than his observation of the back-and-forth movements, was the principal foundation for the arrest.
The reasons for this finding, as opposed to a finding the officer fabricated the observation of the back-and-forth movements to overcome constitutional hurdles, are: (1) the officer’s limited training and experience with traps — he merely participated in one arrest involving traps and overheard other officers discuss traps — prior to his observation of the movements, (2) the fact that the officer’s omission in his paperwork is consistent with his concession he did not suspect the car contained a trap until sometime after his observation of the movements and, most importantly, (3) Sergeant Chu’s specific recollection that he received one or more transmissions from Officer Rosa in which the officer described the movements for a long time and in significant detail.
*142 Under the facts of this case, it was not unreasonable for Officer Rosa to fail to record his observation of the back-and-forth movements. Narcotics enforcement officers are trained for obvious reasons to focus on suspected exchanges of narcotics for currency. Viewed in that light, Officer Rosa’s belief that his observation of an apparent exchange of a large bag of narcotics for a knapsack of money, rather than his observation of the movements, provided the key support for the arrest is credible. It follows that Officer Rosa’s subsequent failure to record the movements in his paperwork does not suggest he fabricated his testimony about his observation of the movements. Instead, it reflects his belief, errant as it is when evaluated by attorneys with the benefit of hindsight, that it was not important for him to record in his report his observation of the movements because that observation was not the primary basis for the arrest.
CONCLUSIONS OF LAW
Based on the credited testimony of the People’s witnesses, I find the police lawfully arrested the defendants and searched the Pontiac. The police had probable cause to arrest the defendants for drug-related offenses based upon Officer Rosa’s transmitted observations of the exchange of the canvas bag for the knapsack and the Pontiac executing what Sergeant Chu knew to be a common trap combination as well as the attendant circumstances. The police also had probable cause to believe that the Pontiac contained drugs based upon Officer Rosa’s observation of the exchange, the discovery of the large amount of currency in the knapsack and other factors. Thus, the warrantless search of the Pontiac was authorized under the automobile exception to the warrant requirement.
At the hearing, Officer Rosa described his observation of the Pontiac’s back-and-forth movements. Officer Rosa was experienced in narcotics enforcement and the area was a well-known drug marketplace. While at the time of his observation Officer Rosa did not suspect the driver was engaging in a common combination to open a trap, he communicated his observation to Sergeant Chu who, based on his experience in the field of organized crime, immediately suspected as much. Research has failed to disclose a New York case which addresses whether a police officer’s suspicion of a trap may enhance the officer’s predicate for an arrest. However, it is consistent with New York suppression law to conclude that where such suspicion is supported by something more than mere guesswork, such as *143 training, experience and observation, it may add significantly to that predicate.
As the Appellate Division, First Department, has noted, the growth and evolution of the drug trade has required courts to recognize a corresponding growth and evolution of the methods used by drug dealers to conceal narcotics. (See, Matter of Devon H., 225 AD2d 135, 138 [1st Dept 1996].) By now, the use of a trap which can be opened only by the performance of a complex protocol should be recognized as one such method. The evidence at the suppression hearing established that drug dealers commonly use traps to conceal drugs and guns, and frequently engage in pattern movements, such as those observed by Officer Rosa, to open traps. Sergeant Chu remembered Officer Rosa had spent as much as 10 minutes describing the Pontiac’s back-and-forth movements, and knew from his own experience that the movements indicated an attempt to access a trap. Thus, I find Officer Rosa’s visual observations of conduct consistent with opening a trap, together with Sergeant Chu’s knowledge of the operation of traps, significantly enhanced the police predicate in support of the arrests.
In any case, the police predicate, even without the observation of the Pontiac’s back-and-forth movements, amounted to probable cause. The police knew that the surveyed area of 138th Street between Willis Avenue and Brown Place was a drug marketplace. Added to that was Officer Rosa’s observation of the late-night exchange of the full bag for the knapsack and Reynoso’s furtive lookout behavior. Moreover, as Sergeant Chu recognized, Reynoso engaged in conduct which reflected a narcotics transaction and not simply a friendly exchange of ordinary items. Reynoso spoke with the Pontiac’s occupants, displayed the bag’s contents, nodded in agreement with something an occupant had said, placed the bag in the car and retrieved the knapsack. After the exchange, Reynoso again furtively looked around. Officer Rosa recognized the Pontiac from having seen drug dealers near it and was aware of the anonymous complaints describing drug dealing from a gray Pontiac. The exchange, when coupled with the drug-prone nature of the area, the lateness of the hour, the Pontiac’s association with drug dealing and Reynoso’s furtive conduct, had all the attributes of a large narcotics transaction.
The fact that Officer Rosa did not see the drugs or currency themselves does not prevent a finding of probable cause. In People v McRay (51 NY2d 594 [1980]), the Court of Appeals established three factors by which to determine whether an of *144 fleer’s observations of suspected drug activity give rise to probable cause: the observation of a "telltale” sign of drug activity, the incidence of narcotics trafficking in the area and the training and experience of the officer making the observations. Other relevant factors include the exchange of money and any furtive or evasive behavior on the part of the participants. (Supra, at 601-604.) Here, all the McRay factors are present. Officer Rosa, an experienced narcotics investigator, observed the late-night exchange in a well-known drug marketplace. Moreover, as the Appellate Division, First Department, recently concluded in analyzing McRay and its progeny, in the 16 years since McRay "experience has taught us that the packaging of choice for illicit narcotics continues to evolve— from glassine envelopes to tinfoil packets * * * white envelopes * * * zip-lock bags * * * clear plastic sandwich bags * * * and vials used for crack cocaine”. (People v Schlaich, 218 AD2d 398, 400 [1st Dept 1996] [citations omitted].) Thus, police observations such as those made in this case may result in a finding of probable cause "even where the objects (or their packaging) transferred in the observed transactions cannot be precisely identified from a distance”. (Supra, at 401.)
Furthermore, Officer Rosa’s radio transmissions were sufficiently detailed to supply his ground team with probable cause. He described the exchange and its location, as well as the Pontiac and Reynoso. The observations of Sergeant Chu and Officer Spiekermann upon arriving at the scene, including their view of Reynoso and the Pontiac, were consistent with the descriptions contained in the transmissions. Adding to the police suspicion was Reynoso’s furtive conduct of shifting the knapsack away from the police cars. Finally, Officer Rosa confirmed to the ground team that Reynoso was the man who had participated in the exchange with the Pontiac. All of these factors gave the police ample probable cause to arrest Reynoso. (See, People v Parris, 83 NY2d 342, 345-346 [1994].) The police properly searched the knapsack incident to that lawful arrest and seized the money found inside.
The police also had probable cause to pursue and arrest Concepcion and Florian. The facts that gave the police probable cause to arrest Reynoso also provided them with probable cause to arrest the occupants of the Pontiac, since they were the other participants in the suspected drug transaction. Indeed, the predicate for arresting the car occupants was even greater than that for arresting Reynoso since the Pontiac fled from the site of the exchange in apparent response to the ar *145 rival of the marked police cars. (See, People v Martinez, 80 NY2d 444, 448 [1992].) Thus, the police properly pursued and stopped the Pontiac and removed the defendants. (See, People v Robinson, 74 NY2d 773, 774 [1989].) Equally proper was Officer Rosa’s search of the defendants at the precinct pursuant to their lawful arrests and consequent seizure of the currency and beepers.
Finally, the police properly searched the Pontiac pursuant to the automobile exception to the warrant requirement. In People v Blasich (73 NY2d 673 [1989]) a police officer approached a car containing the defendant and other occupants and saw inside tools commonly used to break into automobiles. The police took the car and the occupants to the Port Authority Police Station where the officer arrested the defendant for criminal impersonation after the latter displayed a false piece of identification. The car was impounded and searched without a warrant; a gun, incendiary device and cocaine were recovered. (Supra, at 676.) The Court of Appeals held that the search was proper under the automobile exception to the warrant requirement, since the officer had probable cause to arrest the defendant for possession of burglar’s tools and the circumstances gave the police probable cause to believe the car would contain further evidence related to that crime. (Supra, at 680.) Moreover, the Court held that the justification for the search did not dissipate merely because the police took control of the car and impounded it at the Port Authority: "the exception is equally applicable whether the search is conducted at the time and place where the automobile was stopped or whether, instead, the vehicle is impounded and searched after removal to the police station”. (Supra, at 681.) The Court also noted that the search was "reasonably close in time and place to the point of arrest”. (Supra.)
Here, the probable cause which supported the defendants’ arrests extended to the search of the Pontiac. The nexus between the arrests and the Pontiac was obvious: since Officer Rosa observed Reynoso place the full bag in the Pontiac and subsequently recovered the empty bag from the car, the officer knew that the contents of the bag, which he had probable cause to believe were drugs, were hidden somewhere in the car. Additionally, Officer Rosa had discovered the apparent payment for the drugs — over $28,000 — in the knapsack given by a car occupant to Reynoso. Since Officer Rosa did not know where in the Pontiac the drugs were placed, he was authorized to search the area behind the dashboard, particularly in light of his *146 observation through the slit of what appeared, by its packaging, to be heroin. (See, United States v Ross, 456 US 798, 824 [1982].) Moreover, under Blasich (supra), Officer Rosa was permitted to conduct the search of the Pontiac at the precinct rather than at the place of the arrest. Last, the search took place about a half hour after the arrest and relatively close to the arrest scene. Given those facts, Officer Rosa did not need to secure a warrant before searching the Pontiac.
In sum, I find that the police had probable cause to arrest the defendants and search them and the knapsack incident to those arrests. I also find that the police had probable cause to search the Pontiac. Accordingly, the defense motions to suppress the evidence recovered as a result of those searches are denied.